UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CALVIN P. CONGDEN,

        Plaintiff,                          Case No. 17-cv-13515
vs.                                        HON. MARK A. GOLDSMITH

MICHIGAN DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
et al.,

        Defendants.
_____/

**OPINION & ORDER**
**GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (Dkt. 7)**

This matter is before the Court on Defendants Michigan Department of Health and Human Services ("DHHS"), Allison Zinn, Zoe Lyons, and Emilee Hudson's motion to dismiss (Dkt. 7). The issues have been fully briefed, and a hearing was held on May 3, 2018. For the reasons stated below, the Court grants in part and denies in part Defendants' motion.

**I. BACKGROUND**

Plaintiff Calvin Congden is a former officer with Child Protective Services ("CPS"), a division of DHHS. Compl. ¶ 10 (Dkt. 1). Congden began his position with CPS in the summer of 2015, on a one year at-will probationary period, after serving in the United States Army, and as a corrections officer with the State of Michigan. Id. ¶¶ 13-15. As a result of his military service, Congden was diagnosed with Post-Traumatic Stress Disorder ("PTSD") and anxiety. Id. ¶ 12.

Each year during the winter holidays, Congden would dress up as Santa Claus for a charity event. Id. ¶ 16. On December 15, 2015, prior to attending that year's event, Congden put on his Santa Claus outfit at home, and posed for a picture carrying his legally purchased semiautomatic

1

rifle. Id. ¶¶ 17, 19. Congden subsequently posted the picture to his Facebook page. Id. ¶ 19. Soon thereafter, the picture was viewed by Zinn, a managerial employee at DHHS. Id. ¶ 23. After viewing the picture, Zinn told Congden's coworkers to beware of Congden because he was a veteran, owned firearms, and "looked crazy" in the Facebook picture. Id.

Congden later learned of Zinn's statements and contacted his state representative on January 10, 2016 to inform her of what he perceived to be Zinn's discrimination against him as a state employee. Id. ¶ 24. The next day, Congden spoke with Hudson, another managerial employee at DHHS, to inform her of Zinn's comments. Id. ¶ 25. He informed Hudson that he is a disabled veteran and objected to Zinn's remarks. Id. Congden also met with Lyons, a managerial employee at DHHS, to let her know that he took issue with Zinn's remarks. Id. ¶ 26. Lyons asked Congden if he had contacted his state representative about this issue, to which Congden acknowledged that he had. Id. ¶¶ 27-28.

Two weeks after his meetings with Hudson and Lyons, Congden received a disciplinary action for the first time at DHHS. Id. ¶ 29. Over the next several months, Congden continued to receive write-ups for minor infractions such as falling behind on documentation and making simple grammatical errors; other employees were not disciplined for identical conduct. Id. ¶¶ 31-32. During Congden's nine-month review, he was told by Hudson that he was "emotionally unfit" for his position. Id. ¶ 33. On July 5, 2016, Congden was informed that his performance during the one-year probationary period was unsatisfactory, and that he was being terminated prior to the end of the period. Id. ¶ 34. Congden's employment with DHHS ceased on July 15, 2016, after he was allegedly constructively discharged. Id. ¶ 35.

Congden now brings this suit, alleging that Defendants engaged in First Amendment retaliation, Second Amendment retaliation, and disability discrimination pursuant to the Rehabilitation Act and the Americans with Disabilities Act ("ADA").

## II. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

## III. ANALYSIS

### A. Americans with Disabilities Act

Defendants first argue that Congden's claim brought under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq., should be dismissed because it is barred by the Eleventh Amendment. The Eleventh Amendment states that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "Although by its terms the Amendment applies only to suits against a State by citizens of another State, [the Supreme Court's] cases have extended the Amendment's applicability to suits by citizens against their own States." Carten v. Kent State Univ., 282 F.3d 391, 394 (6th Cir. 2002) (quoting Bd. of Trs. v. Garrett, 531 U.S. 356, 363 (2001)).

However, the Supreme Court has also held that "Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and act[s] pursuant to a valid grant of constitutional authority." Garrett, 531 U.S. at 363. In Garrett, the Court addressed whether the unequivocal abrogation of immunity in Title I of the ADA, which prohibits employers, including states, from discriminating in employment against individuals with disabilities, see 42 U.S.C. §§ 12111–17, was constitutional. The Court ultimately concluded that the Constitution, specifically Section V of the Fourteenth Amendment, did not grant Congress the authority to abrogate the states' Eleventh Amendment immunity from suits seeking money damages under Title I of the ADA. Garrett, 531 U.S. at 374.

In their motion, Defendants argue that Garrett bars Congden's ADA claim because he is seeking monetary damages under Title I. However, as Congden notes, Count IV of his complaint, the count alleging a violation of the ADA, states that "Plaintiff seeks injunctive relief under the ADA against the Individual Defendants in their official capacity to remedy their lawful behavior." Compl. ¶ 77. Pursuant to Ex parte Young, 209 U.S. 123 (1908), "individuals can seek prospective injunctive relief for Title I violations." See Whitfield v. Tennessee, 639 F.3d 253, 257 (6th Cir. 2011). "In order to qualify under Ex parte Young, such an action must seek prospective relief to end a continuing violation of federal law" by individual state officials. Carten, 282 F.3d at 395.

Congden's complaint makes clear that he is seeking injunctive relief in the form of an order "reinstating Plaintiff to the positions he would have if there had been no wrongdoing by Defendants." Compl., Relief Requested. At oral argument, counsel for Defendants conceded that Congden was properly seeking injunctive relief pursuant to Ex Parte Young, and stated that Defendants were withdrawing their motion to dismiss as to this claim. As a result, the Court denies Defendants' motion to dismiss as to Congden's ADA claim.

4

**B. Settlement Agreement**

In their motion, Defendants argued that Congden's claims are barred by a July 15, 2016 settlement agreement that was entered into between his union and DHHS. However, in their reply, DHHS states that "for purposes of this Motion to Dismiss only, Defendant withdraws its [a]rgument . . . concerning whether the claims are barred by the settlement agreement previously negotiated." Defs. Reply at 5, n. 2. As a result, the Court need not consider this argument at this stage of the proceedings.

**C. Second Amendment Retaliation**

Defendants next argue that the Court should dismiss Congden's Second Amendment retaliation claim against Zinn, Hudson, and Lyons because they are entitled to qualified immunity. A constitutional retaliation claim consists of three elements: (i) the plaintiff engaged in constitutionally protected conduct; (ii) an adverse action was taken against the plaintiff "that would deter a person of ordinary firmness from continuing to engage in that conduct"; and (iii) there is a causal connection between the protected conduct and the adverse action. See Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999).

Defendant do not argue that Congden has failed to satisfy the elements of a Second Amendment retaliation claim. They instead argue that the claim should be dismissed because there is no clearly established right to be free from retaliation for possessing a weapon. "[T]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Middaugh v. City of Three Rivers, 684 F. App'x 522, 526 (6th Cir. 2017) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, (1982)). "[T]he court makes two inquiries when resolving qualified immunity claims: (1) whether the facts, viewed in the light

5

most favorable to the plaintiff, show a violation of a constitutional right, and (2) whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct. Cochran v. Gilliam, 656 F.3d 300, 306 (6th Cir. 2011) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). These inquiries can be addressed in any order. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). When considering a motion to dismiss, "[t]he test is whether, reading the complaint in the light most favorable to the plaintiff, it is plausible that an official's acts violated the plaintiff's clearly established constitutional right." Heyne v. Metro. Nashville Pub. Sch., 655 F.3d 556, 562–563 (6th Cir. 2011).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." D.C. v. Wesby, 138 S. Ct. 577, 589–590 (2018) (internal citations and quotations omitted). "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." Id. at 590. In other words, "[t]he rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. (quoting Saucier, 533 U.S. at 202).

Congden argues that the Supreme Court's ruling in D.C. v. Heller, 554 U.S. 570 (2008), clearly established his right under the Second Amendment "to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense or sporting, within their home." Compl. ¶ 53. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In Heller, the Court held that "the Second

6

Amendment conferred an individual right to keep and bear arms." Id. at 595. The Court held that the amendment's prefatory clause, the reference to preserving a well-regulated militia, "does not suggest that preserving the militia was the only reason Americans valued the ancient right [to bear arms]; most undoubtedly thought it even more important for self-defense and hunting." Id. at 599. The Court identified self-defense as the "central component" of the right to bear arms. Id. As a result, the Court held that the District of Columbia's "ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." Id. at 635.

Congden contends that Heller clearly established that the Second Amendment protects the right to own and possess a firearm inside one's own home. Heller does not stand for such a broad proposition. While the Court held that a ban on all handguns violated the Second Amendment because it prohibited the right to self-defense, it also noted that "the sorts of weapons protected [by the Second Amendment] were those 'in common use at the time.'" Id. at 627 (quoting Miller, 307 U.S. at 179). The Court held that this limitation to the right to bear arms "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" The Court also noted that

> [i]t may be objected that if weapons that are most useful in military service—M–16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty.

Id.

Thus, the Court in Heller seemed to at least acknowledge that there is no Second Amendment right to carry a semiautomatic rifle like the one depicted in Congden's Facebook post.

7

At the very least, it cannot be said that Heller clearly established a constitutional right to carry such a weapon, regardless of whether it is possessed within the home. See Friedman v. City of Highland Park, Ill., 136 S. Ct. 447 (2015) (denying petition for writ of certiorari following Seventh Circuit's affirmance of ruling dismissing challenge to ordinance banning semiautomatic firearms); see also Worman v. Healey, Case No. 17-10107, 2018 WL 1663445, at *8 (D. Mass. Apr. 5, 2018) ("The undisputed facts in this record convincingly demonstrate that the AR–15 and LCMs banned by the Act are 'weapons that are most useful in military service.' As matter of law, these weapons and LCMs thus fall outside the scope of the Second Amendment and may be banned.") (quoting Heller, 554 U.S. at 627). As a result, the individual Defendants are entitled to qualified immunity on Congden's Second Amendment retaliation claim.

### D. First Amendment Retaliation

Zinn, Hudson, and Lyons also move to dismiss the First Amendment retaliation claim brought against them. Congden asserts that Defendants engaged in two forms of First Amendment retaliation against him: (i) he was constructively discharged because he raised concerns to his state representative, coworkers, and superiors regarding Zinn's comments about his Facebook post; and (ii) he was retaliated against for the Facebook post itself. Defendants argue that the first theory fails to state a claim, and that the second is barred by qualified immunity. Each argument will be addressed in turn.

#### 1. Congden's Complaints to State Representative and Colleagues

Defendants argue that, because Congden was a public employee, his complaints to his representative and colleagues are not protected First Amendment activity. "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). "However, public employees do not forfeit all

their First Amendment rights simply because they are employed by the state or a municipality." Handy-Clay v. City of Memphis, Tenn., 695 F.3d 531, 539 (6th Cir. 2012). "The Supreme Court has determined that the First Amendment protects a public employee's right, under certain circumstances, to speak as a citizen on matters of public concern." Id. (citing Garcetti, 547 U.S. at 417). "However, when a public employee speaks as an employee on matters of personal interest, 'a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.'" Id. (quoting Connick v. Myers, 461 U.S. 138, 147 (1983)).

The Court in Garcetti set forth a three-part test that a public employee must satisfy to show that his speech was constitutionally protected: (i) the speech was made as a private citizen; (ii) the speech involved a matter of public concern; (iii) the individual's interest as a citizen in speaking on the matter outweighed the state's interest, as an employer, in promoting the efficiency of its public services. Garcetti, 547 U.S. at 417-418. "The critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Lane v. Franks, 134 S. Ct. 2369, 2379 (2014).

To determine whether speech was made as a private citizen, courts consider "the impetus for her speech, the setting of her speech, the speech's audience, and its general subject matter." Handy-Clay, 695 F.3d at 540 (internal citation and quotations omitted). Courts also consider whether the statements were made up the chain of command, or "whether the content of the speech is nothing more than the quintessential employee beef: management has acted incompetently." Id. (quoting Haynes v. City of Circleville, Ohio, 474 F.3d 357, 365 (6th Cir. 2007)).

The complaint states that Congden spoke with his state representative, Hudson, and Lyons regarding Zinn's comments about his Facebook post. The Court holds that all three complaints

9

were made in Congden's capacity as a citizen, rather than as an employee. His speech to all three individuals is best characterized as voicing concern that a colleague (a public official) was engaging in discrimination. It cannot be said that voicing a concern over discrimination, especially to a state representative (someone clearly outside of the chain of command) was an act done "pursuant to [an employee's] official responsibilities." Garcetti, 547 U.S. at 424.

While Defendants attempt to analogize the present case to Garcetti, the cases involve very different facts. In Garcetti, a prosecutor alleged that he suffered adverse employment actions after he wrote a memorandum stating that charges against a defendant should be dropped due to police misconduct. The Court held that "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." Id. The Court ultimately concluded that the prosecutor's First Amendment claim failed because "the parties in this case do not dispute that Ceballos wrote his disposition memo pursuant to his employment duties." Id.

Here, Congden was not voicing a complaint regarding his job as a CPS officer. He did not complain to his representative or to Lyons or Hudson that he did not agree with a particular decision the agency made with regard to a child. He did not make a statement regarding how the agency was run, or that "management ha[d] acted incompetently." Haynes, 474 F.3d at 365. He instead was voicing his concern that a member of the agency was discriminating against him based on free speech and his status as a disabled veteran. It cannot be said that such an action was "ordinarily within the scope" of Congden's position as a CPS officer. Lane, 134 S. Ct. at 2379; see also Handy-Clay, 695 F.3d at 542 ("conversations with individuals outside her department were clearly not part of her official duties."); Pucci v. Nineteenth Dist. Court, 628 F.3d 752, 768 (6th Cir. 2010) (holding that court administrator's complaint about judge's religious references in

court was made as a citizen because it was outside of her normal duties); Hughes v. Region VII Area Agency on Aging, 542 F.3d 169, 181 (6th Cir. 2008) (speaking to reporter about sexual assault allegations against a colleague was outside the scope of the plaintiff's employment). As such, Congden's speech is best characterized as that of a private citizen, rather than as a public employee.

The Court must also determine whether Congden's speech involved a matter of public concern. The Sixth Circuit "has elucidated the distinction between matters of public concern and personnel matters." Boulton v. Swanson, 795 F.3d 526, 532 (6th Cir. 2015). "[M]ere assertions of incompetence and poor management decision-making to be run-of-the-mill employment disputes—particularly when the recommended course of action would benefit the employee." Id. However, "speech addresses a matter of public concern when it alleges corruption and misuse of public funds; failure to follow state law; major state policy decisions; or discrimination in some form." Id. (citations omitted) (emphasis added).

The Sixth Circuit has held that "statements relating to charges of discrimination leveled at public employers" involve matters of public concern. Hughes, 542 F.3d at 182 (internal citation and quotations omitted). In Hughes, an employee with a state-funded retirement home told a reporter about sexual harassment allegations against a supervisor, and the employee's belief that a colleague had been terminated for advocating for an investigation into the allegations. The court held that "such statements clearly address matters of public concern." Id.

In Pucci, the court held that the plaintiff's complaints about a judge's use of religious language in court "implicates the propriety and legality of public, in-court judicial conduct, and renders her speech of sufficient public gravity to warrant First Amendment protection." Pucci, 628 F.3d at 768. The court also noted that "[p]ublic interest is near its zenith when ensuring that

11

public organizations are being operated in accordance with the law." Id. (quoting Marohnic v. Walker, 800 F.2d 613, 616 (6th Cir. 1986)).

As stated above, Congden's statements do not involve mere complaints over incompetence or poor decision-making by management. His complaints alleged that Zinn was discriminating against him for posting a picture holding a gun, and for being a disabled veteran. As such, the statements fall within the parameters of public concern.

Finally, the Court must determine whether Congden's interest as a citizen in speaking on the matter outweighed the state's interest, as an employer, in promoting the efficiency of its public services. Garcetti, 547 U.S. at 417-418. Defendants do not argue, and it cannot be inferred from the complaint, that Congden's complaints to his state representative or to Hudson or Lyons in any way impeded DHHS's operations. See Pucci, 628 F.3d at 768 n. 13 ("Somers, however, has offered no reason that raising the sorts of concerns voiced here would jeopardize judicial efficiency."). As a result, Congden has sufficiently alleged that his complaints to his state representative, and to Hudson and Lyons, constitute protected First Amendment activity.[1]

**2. Congden's Facebook Post**

Defendants do not contend that Congden has failed to plead the elements of a First Amendment retaliation claim as it relates to his Facebook post. They instead argue that the claim

---

[1] Defendants do not address the remaining elements of a First Amendment retaliation claim, i.e. whether Congden suffered an adverse employment action and whether it was a result of his protected activity. Thus, the Court need not address these elements. Even if these elements were disputed, Congden has properly alleged that, shortly after voicing his concerns, he began receiving unwarranted discipline that ultimately culminated in his constructive discharge. Viewing the complaint in the light most favorable to Congden, this close temporal proximity between his complaints and constructive discharge give rise to an inference of First Amendment retaliation. See Dye v. Office of the Racing Comm'n, 702 F.3d 286, 305 (6th Cir. 2012) ("A causal link can be shown through direct or circumstantial evidence, including showing temporal proximity between engaging in protected activity and suffering an adverse employment action that may create an inference of causation.").

should be dismissed because they are entitled to qualified immunity. They argue that it was not clearly established that Congden's post was protected First Amendment activity because "the interplay between social media and the First Amendment is still relatively unknown." Def. Mot. at 17 (citing Packingham v. North Carolina, 137 S. Ct. 1730, 1736 (2017)).

This argument is unavailing. Courts have routinely recognized that posting on Facebook is a form of First Amendment activity. See, e.g., Meadows v. Enyeart, 627 F. App'x 496, 503 (6th Cir. 2015); Butler v. Brown, No. 13-13738, 2014 WL 1776035, at *5 (E.D. Mich. May 5, 2014). Because it was clearly established that a Facebook post is protected First-Amendment activity, Defendants are not entitled to qualified immunity.

**E. Rehabilitation Act**

Finally, Defendants argue that Congden's claim under the Rehabilitation Act of 1973, 29 U.S.C. § 791, et seq., should be dismissed for failure to state a claim. The Rehabilitation Act states in pertinent part that "no otherwise qualified individual with a disability . . . shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). When evaluating claims under the Rehabilitation Act, the Sixth Circuit applies the burden-shifting framework set forth in McDonnel-Douglas Corp. v. Green, 411 U.S. 792 (1973). See Gribcheck v. Runyon, 245 F.3d 547, 550 (6th Cir. 2001). Under this framework, a plaintiff must establish a prima facie case of discrimination. If this burden is met, the burden of production then shifts to the employer "to articulate some legitimate, nondiscriminatory reasons" for its actions. Id. (quoting McDonnell Douglas, 450 U.S. at 802). If the employer provides such a reason, the burden shifts again to the plaintiff to prove by a preponderance of the evidence that the reason offered by the employer is a pretext. Id.

To make out a prima facie case under the Rehabilitation Act, "a plaintiff in a covered position must establish that he is: 1) an individual with a disability under the Act, 2) otherwise qualified for the job with or without a reasonable accommodation, and 3) being discriminated against solely because of his handicap." Crocker v. Runyon, 207 F.3d 314, 318 (6th Cir. 2000).

In their motion, Defendants argue that Congden did not suffer an adverse employment action because he voluntarily resigned pursuant to the settlement agreement. They also argue that there is no causal connection between his disability and his resignation.

With regard to Congden's resignation, Defendants indicated in their reply that they are withdrawing their argument at this stage that Congden's claims are barred by the settlement agreement. As a result, it does not appear that they still assert Congden voluntarily resigned from his position at DHHS.

A review of his complaint indicates that he has properly alleged he was discriminated against by DHHS because of his PTSD and anxiety. In Rehabilitation Act cases, "[t]emporal proximity can often help meet [the] causal burden, and where the adverse action comes very close in time after the exercise of protected activity, such temporal proximity . . . is significant enough to meet the burden alone." A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ., 711 F.3d 687, 699 (6th Cir. 2013).

Congden alleges that, shortly after he posted the picture in December 2015, Zinn told his coworkers to "beware of Plaintiff because he was a veteran, owned firearms, and 'looked crazy' in the picture posted to Facebook depicting him dressed as Santa Claus." Compl. ¶ 23. After informing Hudson and Lyons of Zinn's comments and of his status as a disabled veteran in January 2016, id. ¶¶ 25-26, Congden began receiving disciplinary actions for the first time as a DHHS employee. Id. ¶ 29. These write-ups continued for several months, despite the fact that they were

for minor infractions for which Congden's coworkers were not punished. Id. ¶¶ 30-32. After nine months on the job, Congden was informed by Hudson that he "emotionally unfit" to continue; shortly thereafter, he was told that his performance was unsatisfactory and that he would be terminated prior to the end of his one-year probationary period. Id. ¶¶ 33-34. This close proximity between Zinn's comments,

Congden informing Hudson and Lyons that he was a disabled veteran, and the pattern of disciplinary write-ups gives rise to the inference that there was a causal connection between Congden's disability and his constructive discharge from DHHS. This conclusion is bolstered by Congden's allegation that Hudson called him "emotionally unfit" for his position at DHHS. As a result, Congden has properly pled a claim of discrimination under the Rehabilitation Act.

## IV. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss (Dkt. 7). The Court grants Defendants' motion as to Congden's Second Amendment retaliation claim, and denies the motion as to the ADA, First Amendment retaliation, and Rehabilitation Act claims.

SO ORDERED.

Dated: May 29, 2018　　　　　　　　　　　　s/Mark A. Goldsmith
　　　Detroit, Michigan　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 29, 2018.

　　　　　　　　　　　　　　　　　　　　　s/Karri Sandusky
　　　　　　　　　　　　　　　　　　　　　Case Manager